**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Securities and Exchange Commission, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-cv-4744 |
| | ) | |
| City of Harvey, Illinois, and Joseph T. Letke, | ) | Hon. Amy J. St. Eve |
| | ) | |
| Defendants. | | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
ITS APPLICATION FOR FINAL JUDGMENT BY DEFAULT
<u>AS TO DEFENDANT JOSEPH T. LETKE</u>**

Plaintiff, the United States Securities and Exchange Commission ("SEC" or

"Commission"), respectfully submits this memorandum in support of its Application for Entry of

Final Judgment by Default against Defendant Joseph Letke ("Letke").

**<u>PROCEDURAL BACKGROUND</u>**

On June 24, 2014, the SEC filed a complaint against the City of Harvey, Illinois

("Harvey") and against Letke, who was Harvey's then-Comptroller. The SEC's Complaint

alleged that Harvey and Letke violated various provisions of the federal securities laws. (*See*

Docket No. 1; Declaration of Eric M. Phillips, submitted herewith, ¶ 1)  The SEC alleged that

Harvey and Letke violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange

Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (c)]

and Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §

77q(a)(1), (3)], and that Harvey violated Section 10(b) of the Exchange Act and Rule 10b-5(b)

thereunder [17 C.F.R. § 240.10b-5(b)] and Section 17(a)(2) of the Securities Act.  (Phillips Decl.

¶ 2)  In its Complaint, the SEC sought against Letke injunctive relief against future securities law violations, injunctive relief against Letke's future participation in municipal securities offerings, disgorgement of ill-gotten gains, prejudgment interest, and civil penalties.  (Complaint, pp. 27-29; Phillips Decl. ¶ 3)

On July 15, 2014, the SEC served Letke with the Complaint and Summons by delivering the Complaint and Summons to an agent authorized by appointment to accept service on Letke's behalf.  (Docket No. 29, Phillips Decl. ¶ 4)  On September 3, 2014, the SEC filed an Application for Clerk's Entry of Default against Letke (the "First Application") after Letke filed a *pro se* appearance but failed to answer or otherwise respond to the complaint by the August 29, 2014 deadline that the Court had set.  (Docket No. 48, Phillips Decl. ¶ 5)  After Letke filed a motion to extend the deadline to answer or otherwise plead, the Court denied the SEC's First Application and extended the deadline for Letke to answer or otherwise plead to September 19, 2014. (Docket No. 50, Phillips Decl. ¶ 6)  On October 1, 2014, Letke filed another motion to extend the deadline to answer or otherwise plead.  (Docket No. 62, Phillips Decl. ¶ 7)  The Court granted Letke's motion in part and extended the deadline for Letke to answer or otherwise plead to October 17, 2014.  (Docket No. 66, Phillips Decl. ¶ 8)   After Letke failed to answer or otherwise plead by the October 17 deadline, the Court found Letke in default on October 21, 2014. (Docket No. 67, Phillips Decl. ¶ 9)

## ARGUMENT

### I.  ENTRY OF A DEFAULT JUDGMENT IS APPROPRIATE

Entry of a judgment by default is appropriate against Letke.  The Court has found Letke to be in default.  Accordingly, the factual allegations of the Complaint, except those relating to

damages, are accepted as true. *See*, *e.g.*, *E360 Insight v. Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007).

## II. FACTS

The allegations of the Complaint, which are accepted as true for default purposes, can be summarized as follows:

### A. Background Facts

Beginning in 2008, Harvey and its Comptroller, Letke, engaged in a scheme to divert bond proceeds for improper purposes, including undisclosed payments to Letke. (Complaint, ¶ 1)

Letke is a certified public accountant who is the principal shareholder of several professional service businesses, including Alli Financial and Public Funding Enterprises (or, Public Funding Group LLC). Alli Financial was formed as a successor corporation to Letke & Associates, of which Letke was also the principal owner. (*Id.*, ¶ 18)

Alli Financial provided accounting and financial consulting services to private and municipal clients, mostly in the south suburbs of Chicago. Letke served as the comptroller for several of these municipalities, including the City of Harvey, and was responsible for the accounting and financial reporting of the municipalities in which he held that position. He also was responsible for providing advice regarding the municipalities' revenues, expenditures, and general financial condition. Alli Financial had accountants onsite at several municipalities to provide accounting and comptroller services, and Alli Financial normally billed the municipalities on an hourly basis. (*Id.*, ¶ 19)

Additionally, Letke and his firm served as a financial advisor to Harvey in connection with the 2008, 2009 and 2010 Bond Offerings, discussed below. (*Id.*, ¶ 21)

### B. Harvey's 2008 Bond Offering

In August 2008, Harvey conducted a municipal bond offering (the "2008 Bond Offering") to sell $6,025,000 of Hotel-Motel Tax Revenue Bonds, Series 2008A (the "2008 Bonds").  (*Id.*, ¶ 24)

As part of the 2008 Bond Offering, Harvey provided to potential investors an Official Statement ("2008 Official Statement") with information regarding the offering.  (*Id.*, ¶ 26)  The 2008 Official Statement stated that the 2008 Bonds were being issued to finance: (i) a portion of the acquisition by the developer of the project, Harvey Hotel Properties (the "Developer") of a parcel of property at 17040 South Halsted Street, Harvey, Illinois ("Hotel Property"); (ii) the rehabilitation of the facilities located on the Hotel Property "to provide for a full-service hotel and conference center" ("Hotel Development Project"); and (iii) to pay for administrative, financing, legal and other costs associated with the 2008 Bond Offering.  (*Id.*, ¶ 27)  According to the 2008 Official Statement, the Hotel Property would be improved with a Holiday Inn hotel and conference center that would include, among other things, 239 rooms, a restaurant and lounge, an indoor pool, and 10,500 square feet of meeting space.  (*Id.*, ¶ 28)

After receiving Harvey's representations in the 2008 Official Statement about how proceeds from the 2008 Bond Offering would be used, investors purchased a total of $6.025 million of 2008 Bonds.  (*Id.*, ¶ 32)

### C. Harvey's 2009 Bond Offering

In or about August 2009, the City of Harvey conducted a municipal bond offering (the "2009 Bond Offering") to sell $3,000,000 of Series 2009A Bonds (the "2009 Bonds").  (*Id.*, ¶ 33)

As part of the 2009 Bond Offering, the City of Harvey provided to potential investors a Tax Exemption Certificate ("2009 Tax Exemption Certificate") with information regarding the offering. (*Id.*, ¶ 35) The 2009 Tax Exemption Certificate stated that the 2009 Bonds were being issued to (i) pay a portion of the cost of the Hotel Redevelopment Project and (ii) to pay the Costs of Issuance of the 2009 Bonds. (*Id.*, ¶ 36)

After receiving Harvey's representations in the 2009 Tax Exemption Certificate about how proceeds from the 2009 Bond Offering would be used, and how tax revenues would be generated to repay bondholders, a single investor purchased a total of $3 million of 2009 Bonds in approximately August 2009. (*Id.*, ¶ 40)

**D. Harvey's 2010 Bond Offering**

In or about September 2010, the City of Harvey conducted a municipal bond offering (the "2010 Bond Offering") to sell $5,000,000 of Series 2010 Bonds (the "2010 Bonds"). (*Id.*, ¶ 41)

As part of the 2010 Bond Offering, the City of Harvey provided to potential investors an Official Statement ("2010 Official Statement") with information regarding the offering. (*Id.*, ¶ 42) The 2010 Official Statement stated that the 2010 Bonds were being issued for: (i) reimbursing the Developer, for eligible costs for the Hotel Redevelopment Project; (ii) reimbursing the City for advances made to the Developer; (iii) paying bond issuance expenses; and (iv) providing funds for future costs for the Hotel Redevelopment Project. (*Id.*, ¶ 43)

After receiving Harvey's representations in the 2010 Official Statement about how proceeds from the 2010 Bond Offering would be used, and how tax revenues would be generated to repay bondholders, a single investor purchased a total of $5 million of 2010 Bonds. (*Id.*, ¶ 46)

### E.  Letke's Participation in a Scheme to Divert Municipal Bond Proceeds

Beginning in 2008, Harvey and Letke engaged in a scheme to divert bond proceeds for improper purposes, including undisclosed payments to Letke beyond what was disclosed in the bond offering documents, for payroll for the City of Harvey, and for other purposes unrelated to the Hotel Redevelopment Project.  (*Id.*, ¶ 47)

In September 2010, as part of Harvey's and Letke's participation in the scheme to divert bond proceeds, the City of Harvey transferred $1.87 million of the $5 million 2010 Bond proceeds to the Developer.  The Developer then used $1,075,000 to pay off an existing loan for the project, used $100,000 for an undisclosed payment to Letke & Associates, and used an additional $100,000 for a payment to a construction company controlled by the Developer.  (*Id.*, ¶ 68)

In October 2010, as part of Letke's participation in the scheme to divert bond proceeds, the Developer made an additional undisclosed $49,375 payment to Letke & Associates and made an additional $75,000 payment to the construction company controlled by the Developer.  (*Id.*, ¶ 69)

In June 2011, as part of Harvey's and Letke's participation in the scheme to divert bond proceeds, the City of Harvey authorized a $250,000 loan to the Developer.  The $250,000 loan was transferred from an account holding proceeds from the $5 million 2010 Bond Offering.  The Developer then made a $15,000 undisclosed payment to Letke & Associates, made a $30,000 payment to a construction company controlled by the Developer, and made a $57,000 payment to the Developer's majority owner.  (*Id.*, ¶ 70)

### F. The Failure of the Hotel Redevelopment Project

As of 2014, as the result of Harvey's and Letke's participation in the scheme to divert bond related proceeds, the Hotel Redevelopment Project has turned into a fiasco for bond investors and Harvey residents. According to news reports, the proposed Holiday Inn hotel and conference center stands as a decrepit shell. The hotel's façade has many holes in it, and the interior of the hotel appears gutted in places, with dangling wires and exposed studs, according to news reports. (*Id.*, ¶ 73)

### G. Letke's Participation in a Proposed 2010 Bond Offering

As part of a new proposed 2014 offering of bonds (the "Proposed 2014 Bonds"), Harvey prepared a draft Preliminary Limited Offering Memorandum (the "2014 Draft Offering Memorandum"). The 2014 Draft Offering Memorandum was distributed to potential investors in the Proposed 2014 Bonds. (*Id.*, ¶ 79)

The 2014 Draft Offering Memorandum materially misled prospective investors in the 2014 Proposed Bond Offering by, among other things, stating that Harvey intended to issue the bonds for the grocery store development project while omitting to state that bond-related proceeds from the 2008, 2009, and 2010 Bond Offerings and other proceeds earmarked for the Hotel Redevelopment Project already had been misused. (*Id.*, ¶ 83)

Letke was involved in the drafting of the 2014 Draft Offering Memorandum. He authored a document in which he conveyed his comments about various aspects of the 2014 Draft Offering Memorandum. Letke acted as a financial adviser to Harvey for the proposed issuance and was to receive a fee if the bond issuance was completed. (*Id.*, ¶ 87)

### III.LETKE VIOLATED THE SECURITIES LAWS' ANTIFRAUD PROVISIONS

Section 17(a) of the Securities Act generally prohibits any person, in the offer or sale of any security, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder generally prohibits any person, in connection with the purchase or sale of any security, from, directly or indirectly: (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) engaging in any transaction, practice, or course of business that operates or would operate as a fraud or deceit upon any person.  15 U.S.C. §§ 77q(a), 78j(b), 17 C.F.R. § 240.10b-5. Scienter is an element of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act, though scienter need not be shown to establish violations of Sections 17(a)(2) or 17(a)(3) of the Securities Act.  *Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980).

A "scheme to defraud" is "merely a plan or means to obtain something of value by trick or deceit."  *SEC v. Kimmes*, 799 F. Supp. 852, 858 (N.D. Ill. 1992).  To state a claim for scheme liability under Sections 17(a)(1) and (3) of the Securities Act, and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, the SEC must allege "the defendant: (1) committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter."  *SEC v. Langford*, 2013 WL 1943484, at *6 (D. Neb. May 9, 2013) (internal quotes and citation omitted).

Here, all elements are met.  First, Letke engaged in a scheme to defraud by diverting and misusing money raised from the offer or sale of at least three municipal securities offerings.

Second, Letke acted with scienter. In the Seventh Circuit, either knowing or reckless conduct constitutes scienter. *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008); *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). As Comptroller, Letke was in a position to know the purpose of Harvey's bond issuances. When Letke accepted undisclosed payments derived from Harvey's bond issuances, he knew he was taking money that was supposed to be used for the Hotel Redevelopment Project.

Letke's participation in the scheme to divert bond proceeds also satisfies the "in connection with" requirement of Section 10(b). That requirement is met where a defendant accepts money to be used in a securities transaction, but misuses it instead, which is the situation here. *Grippo v. Perazzo*, 357 F.3d 1218, 1223-24 (11th Cir. 2004) ("in connection with" requirement met where defendant accepted and deposited money into his account as payment for securities, even though plaintiff failed to identify any securities that were actually purchased); *SEC v. Zandford*, 535 U.S. 813, 819-20 (2002) (a reasonable construction of the "in connection with" language of Section 10(b) is that it applies to a "broker who accepts payment for securities that he never intends to deliver").

## IV. RELIEF REQUESTED

### A. Permanent Injunctive Relief

The Court has authority to grant the SEC's request for a permanent injunction against future securities law violations pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. In an action for a statutory injunction under Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act, once a violation has been demonstrated, the SEC "need only show that there is a reasonable likelihood of future violations in order to obtain relief." *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir.

1982).  Courts must assess the totality of the circumstances in determining the likelihood of future violations, and should consider: (1) the gravity of harm caused by the offense; (2) the extent of the defendant's participation and his degree of scienter; (3) the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; (4) the defendant's recognition of his own culpability; and (5) the sincerity of his assurances against future violations.  *Id.*

Injunctive relief against future securities law violations is appropriate here.  Letke demonstrated a high degree of scienter in engaging in a fraudulent scheme involving the diversion of Harvey bond proceeds for improper purposes, including for Letke's own personal benefit.  Letke also was heavily involved in the scheme as Harvey's Comptroller and as a financial advisor for Harvey's bond offerings.  The harm caused by Letke's misconduct was severe.  Harvey raised millions of dollars through bond offerings which were supposed to benefit Harvey residents, and instead Harvey and Letke wasted the money.  Harvey's and Letke's misuse of municipal bond proceeds spanned many years.  Letke, meanwhile, has not accepted responsibility for his misconduct and has not given the Court any assurances that he will not engage in securities law violations in the future.  Therefore, this Court should issue a permanent injunction against Letke prohibiting future violations of the antifraud provisions of the federal securities laws.  *See*, *e.g.*, *SEC v. Souza*, 2011 WL 2181365 (E.D. Cal. June 3, 2011) (awarding permanent injunction against defendant as part of default judgment); *SEC v. Strauss*, 2011 WL 1158783 (N.D. Miss. Mar. 28, 2011) (same); *SEC v. Aleksey*, 2007 WL 1789113 (M.D. Fla. June 19, 2007) (same).

In addition, the Court should bar Letke from future participation in municipal securities offerings.  This Court has authority to tailor injunctive relief to the facts of a particular case.  *Cf.*

*S.E.C. v. Drexel Burnham*, 837 F. Supp. at 587, 613 (S.D.N.Y. 1993) (imposing voting trust upon defendants in SEC enforcement action), *aff'd*, *S.E.C. v. Posner*, 16 F.3d 520 (2d Cir. 1994), *cert. denied*, 513 U.S. 1077 (1995).

By abusing his position of trust as a Harvey public official and as a financial advisor to Harvey over a multi-year period, Letke has demonstrated that he is unfit to participate in municipal securities offerings. Accordingly, the Court should bar Letke from future participation in municipal securities offerings to protect investors against possible future misconduct by Letke.

### B. Disgorgement of Ill-Gotten Gains

The authority of a federal court to order disgorgement and prejudgment interest in a Commission enforcement action is well-established. *See, e.g., SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989). Courts have broad discretion in determining whether to order disgorgement, and in calculating the amount of disgorgement. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996).

A court may award disgorgement and prejudgment interest on a default motion without holding an evidentiary hearing, where the existing record is sufficient to establish the appropriate amount to be disgorged. *United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989) (hearing on damages unnecessary if figure can be ascertained from definite figures contained in the documentary evidence or in detailed affidavits).

Further, a court may award disgorgement against an individual for amounts obtained by an entity he owns and controls. *See, e.g., SEC v. Pentagon Capital Management*, 725 F.3d 279, 288 (2d Cir. 2013) (affirming disgorgement award on joint and several basis); *SEC v. Capital Solutions Monthly Income Fund, LP*, 2014 WL 2922644, at *9 (D. Minn. June 27, 2014) (imposing disgorgement against individual who owned company that received ill-gotten gains).

In support of its request for disgorgement, the SEC has provided the Court with documentary evidence and a declaration from its accountant, Scott Hlavacek. These materials establish that Letke, through the firm he owned and controlled, Letke & Associates, received $164,375 in undisclosed compensation derived from Harvey municipal bond offerings. (Hlavacek Decl. at ¶ 27) Because these amounts were ill-gotten and were causally connected to Letke's participation in the fraudulent scheme to divert Harvey municipal bond proceeds, the Court should order Letke to disgorge this $164,375 amount.

### C. Prejudgment Interest

Prejudgment interest is appropriate on disgorgement amounts based on the IRS underpayment rate. *SEC v. Koenig,* 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007), *aff'd in part, remanded in part*, 537 F.3d 736 (7th Cir. 2009). The assessment of prejudgment interest assures that a defendant does not profit in any way from illegal activity. *SEC v. Lipson*, 129 F. Supp. 2d 1148, 1159 (N.D. Ill. 2001), *aff'd*, 278 F.3d 656 (7th Cir. 2002). The SEC has calculated prejudgment interest based on the IRS underpayment rate. (Hlavacek Decl., ¶ 28) The prejudgment interest amount for the $164,375 in disgorgement requested by the SEC for undisclosed payments received by Letke and Letke & Associates relating to Harvey municipal bond issuances is $22,740.23. (*Id.* at ¶ 29) The Court should order Letke to pay this prejudgment interest amount on his ill-gotten gains, for a total amount of disgorgement plus prejudgment interest of $187,115.23.

### D. Civil Penalties

A civil penalty against Letke is appropriate as well.

The Securities Act and Exchange Act authorize district courts to award a civil penalty in SEC enforcement cases. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3). A civil penalty serves to punish

and deter wrongdoers because "disgorgement does not actually result in any actual economic penalty or act as financial disincentive to engage in securities fraud." *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (quoting H.R. Rep. No. 101-616 (1990)).

The Securities Act and Exchange Act create three penalty "tiers" based on a defendant's culpability and the harmfulness of the violation. 15 U.S.C. §§ 77t(d), 78u(d)(3). The third tier is reserved for conduct that (1) involves fraud, deceit, or manipulation, and (2) resulted in substantial losses (or created a risk of such losses) to others. *Id.* §§ 78u(d)(3)(B)(iii). For natural persons, the maximum third-tier penalty for "each such violation" during the period of Letke's violations is the greater of $150,000 or the "gross amount of pecuniary gain" to such person. *Id.*; 17 C.F.R. § 201.1004. With regard to gross pecuniary gain, "many courts have imposed a single penalty equal to the amount of disgorgement." *See SEC v. Graulich*, 2013 WL 3146862, at *7 (D.N.J. June 19, 2013) (citing cases).

District courts have awarded substantial penalties, even in cases involving default judgments. *See, e.g., SEC v. Lowrance*, 2012 WL 2599127, at *7 (N.D. Cal. July 5, 2012) (awarding the "maximum penalties," exceeding $200,000,000 between two defendants); *SEC v. One or More Unknown Traders in the Common Stock of Certain Issuers*, 825 F. Supp. 2d 26, 34 (D.D.C. 2010) (awarding civil penalties equal to the pecuniary gain); *SEC v. Locke Capital Mgmt., Inc.*, 726 F. Supp. 2d 105, 109 (D.R.I. 2010) (awarding civil penalties "equal to three times the disgorgement it owes"); *SEC v. Wynne*, 2010 WL 2898981, at *2 (E.D. Pa. July 20, 2010) (awarding the "maximum statutory penalty"); *SEC v. Becker*, 2010 WL 2165083, at *4 (S.D.N.Y. May 28, 2010) (awarding a third-tier penalty when a defendant defrauded 29 investors out of $1.3 million); *SEC v. Anticevic*, 2010 WL 2077196, at *8 (S.D.N.Y. May 10, 2010) (awarding a penalty of more than $20 million, an amount equal to "three times the total profits");

*SEC v. Great American Tech., Inc.*, 2010 WL 1416121, at *2 (S.D.N.Y. Apr. 8, 2010) (awarding a third-tier civil penalty "equal to the scheme's pecuniary gain: $2,319,160"); *SEC v. Pitters*, 2010 WL 1413194, at *6 (S.D. Fla. Mar. 5, 2010) (awarding the "maximum civil penalty allowable for Third Tier violations"); *SEC v. Aimsi Tech., Inc.*, 650 F. Supp. 2d 296, 309 (S.D.N.Y. 2009) (awarding a third-tier penalty).

When considering the amount of a penalty, courts consider factors such as "the need for deterrence; defendant's acceptance of responsibility; defendant's net worth; the flagrancy of his violation; and other sanctions already imposed for the same conduct." *See SEC v. Michel*, 2008 WL 516369, at *1 (N.D. Ill. Feb. 22, 2008).

This Court should impose a substantial penalty on Letke. As discussed above, Letke obtained ill-gotten gains of over $160,000 derived from his securities laws violations, caused substantial harm to investors and Harvey residents through his misconduct, and engaged in misconduct over a multi-year period, justifying substantial penalties. There is a statutory basis for a sizable civil penalty under either a per violation or gross pecuniary gain basis. Letke repeatedly violated the securities laws over several years, showing that a significant deterrent is necessary in the form of a sizeable penalty.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Commission respectfully requests that the Court grant its application for default judgment pursuant to Fed. R. Civ. P. 55(b)(2) and enter a final judgment against Letke in the form of the accompanying proposed final judgment submitted to the Court.

Dated: January 20, 2015   Respectfully submitted,


        **/s/*Eric M. Phillips*_____**
        Eric M. Phillips
        Eric A. Celauro
        Sally J. Hewitt
        U.S. Securities and Exchange Commission
        175 W. Jackson Blvd., Suite 900
        Chicago, Illinois  60604
        (312) 353-7390

        *Attorneys for the Plaintiff, the United States Securities and Exchange Commission*

## **CERTIFICATE OF SERVICE**

I, Eric M. Phillips, an attorney, being duly sworn, state on oath that on January 20, 2015,

I caused Plaintiff's Memorandum in Support of Its Application for Entry of Default Judgment

Against Defendant Joseph T. Letke to be served upon the following by UPS, overnight delivery,

and via email:

Joseph T. Letke (josephletke@yahoo.com)
20515 Abbey Drive
Frankfort, IL 60423


and upon the following counsel by the Court's CM/ECF system:

Tiffany Ferguson, Esq.
Rachel Steiner, Esq.
*Attorneys for Defendant City of Harvey, Illinois*


/s/ Eric M. Phillips
Eric M. Phillips